[Cite as *In re Baby Boy W.*, 2011-Ohio-2337.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN THE MATTER OF:

    BABY BOY W.,                      CASE NO.  5-10-39

ALLEGED DEPENDENT CHILD,

                                          **O P I N I O N**

    [AMBER W. - APPELLANT].

**Appeal from Hancock County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 21030018**

**Judgment Affirmed**

**Date of Decision:  May 16, 2011**

**APPEARANCES:**

    *Charles R. Hall, Jr.*  for Appellant

    *Mark C. Miller and Benjamin E. Hall*  for Appellee

**PRESTON, J.**

{¶1} Mother-appellant, Amber W. (hereinafter "Amber"), appeals the Hancock County Court of Common Pleas' decision awarding permanent custody of her child, Baby Boy W., to the Hancock County Department of Job and Family Services: Children's Protective Services Unit (hereinafter "CPSU"). For the reasons that follow, we affirm.

{¶2} On June 29, 2010, the trial court issued an ex parte order awarding CPSU emergency temporary custody of Amber's son, Baby Boy W. (Doc. No. 1). On June 30, 2010, CPSU filed a complaint alleging Baby Boy W. was a dependent child as defined in R.C. 2151.04(b)-(d). (Doc. No. 2).

{¶3} At the July 8, 2010 shelter care hearing, the trial court concluded that probable cause existed for the filing of the ex parte order, and that the continued residence in the child's own home would be contrary to the child's best interest. The trial court ordered that the child be placed in CPSU's emergency temporary custody. (Doc. No. 9). The trial court also concluded that reasonable efforts to prevent the removal of the child were unnecessary since Amber had her parental rights involuntarily and permanently terminated with respect to her other two children. (Id.).

{¶4} On September 9, 2010, an adjudication hearing was held, and the trial court found that the child was a dependent child as defined in R.C. 2151.04(b)-(d).

(Doc. No. 19). The trial court scheduled a dispositional hearing for September 16, 2010. (Id.).

{¶5} On September 14, 2010, CPSU filed a motion for a determination that reasonable efforts were unnecessary pursuant to R.C. 2151.419(A)(2). (Doc. No. 20). CPSU requested that a hearing on the motion be held on September 16, 2010 in lieu of the scheduled dispositional hearing. (Id.). On September 16, 2010, the trial court held a hearing on the motion and, thereafter, granted the motion. (Doc. No. 22). The trial court then scheduled a review of the permanency plan for October 12, 2010. (Id.).

{¶6} On September 21, 2010, CPSU filed a motion for permanent custody pursuant to R.C. 2151.353, 2151.413, and 2151.414. (Doc. No. 23).

{¶7} On October 28, 2010, a hearing was held to review the permanency plan wherein the parties stipulated that CPSU had attempted to achieve permanency for the child by filing a motion for permanent custody. (Doc. No. 33).

{¶8} On November 15-16, 2010, the trial court held a hearing on CPSU's motion for permanent custody and, thereafter, took the matter under advisement. (Doc. No. 38). On November 22, 2010, the trial court granted CPSU's motion for permanent custody thereby terminating Amber's parental rights to Baby Boy W. (Doc. No. 39).

{¶9} On December 17, 2010, Amber filed a notice of appeal. (Doc. No. 42). Amber now appeals raising three assignments of error for our review. We elect to address Amber's third assignment of error out of the order presented in her brief.

### ASSIGNMENT OF ERROR NO. I

**THE COURT SHOULD FIND THAT THE JUDGMENT ENTRY APPEALED FROM IN THE HANCOCK COUNTY JUVENILE COURT ON NOVEMBER 22, 2010 IS NOT A FINAL APPEALABLE ORDER.**

{¶10} In her first assignment of error, Amber argues that this Court lacks jurisdiction for lack of a final appealable order since the trial court failed to hold a dispositional hearing.

{¶11} The record indicates that Amber filed a motion to dismiss the case with this Court for lack of a final appealable order on February 7, 2011. On February 24, 2011, however, we denied the motion finding that the judgment entry terminating Amber's parental rights and awarding CPSU permanent custody of Baby Boy W. was a final appealable order under R.C. 2505.02(B)(2).

{¶12} Amber's first assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT'S DECISION TO TERMINATE THE APPELLANT'S PARENTAL RIGHTS AND GRANT PERMANENT CUSTODY TO THE DEPARTMENT VIOLATED THE APPELLANT'S DUE PROCESS RIGHTS.**

{¶13} In her third assignment of error, Amber argues that the trial court violated her procedural due process rights by failing to hold a separate dispositional hearing.

{¶14} When a trial court proceeds on an original neglect, dependency, or abuse complaint under R.C. 2151.35(B)(1), it is required to bifurcate the proceedings into an adjudication and a disposition. *Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 233, 479 N.E.2d 257; *In re J.H.*, 12th Dist. Nos. CA2005-11-019 and CA2005-11-020, 2006-Ohio-3237, ¶¶22-27. A trial court need not hold these hearings on separate days or even at separate times; however, "there must be a definitive bifurcation of the proceedings so that the parties are afforded an opportunity to present evidence at both the adjudicatory and dispositional hearings." *In re J.H.*, 2006-Ohio-3237, at ¶27. A trial court's failure to bifurcate proceedings, as required both by R.C. 2151.35(B)(1) and Juv.R. 34(A), constitutes reversible error. *Baby Girl Baxter*, 17 Ohio St.3d at 233. See, also, *In re Malone* 178 Ohio App.3d 219, 2008-Ohio-4412, 897 N.E.2d 672, ¶20.

{¶15} The record in this case demonstrates that the trial court held a dispositional hearing on November 15-16, 2010, though not specifically labeled as such by the trial court or the parties herein. Since Amber had her parental rights terminated with respect to two of Baby Boy W.'s siblings, the trial court determined that the agency was not required to make reasonable efforts pursuant

to R.C. 2151.419(A)(2)(e). Following that determination, R.C. 2151.413(D)(2) required CPSU to file a motion requesting permanent custody. R.C. 2151.414(A)(2) provides, in pertinent part, "[i]f a motion is made under division (D)(2) of section 2151.413 of the Revised Code and no dispositional hearing has been held in the case, the court may hear the motion in the dispositional hearing required by division (B) of section 2151.35 of the Revised Code." Our review of the record leads us to conclude that the trial court considered CPSU's motion for permanent custody *as part of* its November 15-16, 2010 dispositional hearing in accordance with R.C. 2151.414(A)(2). As such, the trial court did not violate Amber's procedural due process rights.

{¶16} Amber's third assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. II

**THE JUVENILE COURT ERRED AND ABUSED ITS DISCRETION AS THE FINDINGS MADE BY THE COURT TO SUPPORT ITS GRANT OF PERMANENT CUSTODY TO HCJFS ARE NOT CONSISTENT WITH THE STANDARD OF CLEAR AND CONVINCING EVIDENCE, AND THE TRIAL COURT'S GRANT OF PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶17} In her second assignment of error, Amber argues that CPSU failed to clearly and convincingly demonstrate the required findings under R.C. 2151.414 for the trial court to grant it permanent custody. Amber similarly argues that the

trial court's grant of permanent custody was against the manifest weight of the evidence.

{¶18} "It is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, quoting *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. Therefore, "a parent's right to the custody of his or her child has been deemed 'paramount.'" *Hayes*, 79 Ohio St.3d at 48, citing *In re Perales* (1977), 52 Ohio St.2d 89, 97, 369 N.E.2d 1047. Because parents have a fundamental liberty interest in the custody of their own children, this important legal right is "protected by law and, thus, comes within the purview of a 'substantial right[.]'" *In re Murray*, 52 Ohio St.3d at 157. Therefore, parents "'must be afforded every procedural and substantive protection the law allows.'" *Hayes*, 79 Ohio St.3d at 48, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45.

{¶19} R.C. 2151.414(B)(2) requires a court to grant permanent custody of the child to the moving party "if the court determines in accordance with [R.C. 2151.414(E)] that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" *and* determines that permanent custody is in the best interest of the child by considering all relevant factors, including but not limited to, the five factors listed in R.C. 2151.414(D). If

the court determines by clear and convincing evidence that one or more of the sixteen factors listed in R.C. 2151.414(E) exist, the court "*shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." R.C. 2151.414(E) (emphasis added).

{¶20} The trial court's findings must be supported by clear and convincing evidence and will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. R.C. 2151.414(B); *In re Forest S.* (1995), 102 Ohio App.3d 338, 344-45, 657 N.E.2d 307; *Cross v. Ledford* (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus.

{¶21} At the beginning of the dispositional hearing, Amber stipulated, in pertinent part, that she had her parental rights permanently and involuntarily terminated as to two of Baby Boy W.'s siblings. (Nov. 15-16, 2010 Tr. at 10-12). Judgment entries reflecting that fact were also admitted by stipulation. (CPSU Exs. 5-6). Thereafter, Robin Brown, a mental health/substance abuse counselor at Century Health, testified that Amber was a former Century Health client in 2003, and, in 2007, she diagnosed Amber with major depression, recurrent and moderate rule-out delusional disorder. (Nov. 15-16, 2010 Tr. at 15-18). Brown testified that delusional disorder is "a form of mental illness where someone believes that

something that they're saying is true but there's no basis in fact for it." (Id. at 18).

"Rule out" means that they were still determining whether or not Amber, in fact, had a delusional disorder. (Id.). Brown testified, however, that Amber had an actual diagnosis of post-traumatic stress disorder and attention deficit disorder, as well as major depression. (Id. at 19). Brown testified that doctors were concerned that Amber might have a delusional disorder from statements she made from 2007 to 2009. (Id. at 20). Brown testified that Dr. Darlene Barnes noted in June 2008 that Amber was "forgetful, distracted, overwhelmed, easily agitated, irritable, irrational in reasoning and thought * * * did not function well around others and had difficultly working collaboratively." (Id. at 20-21). Brown testified that Amber was prescribed counseling and medication, but Amber stopped and started the counseling sessions on several different occasions and failed to take her medications. (Id. at 20-23). Amber's case was closed in May 2009 for non-compliance, according to Brown. (Id.). Brown testified that CPSU referred Amber to Century Health in August 2010 for a substance abuse assessment. (Id. at 22-23). Brown testified that Denise Kring, the Century Health mental therapist who saw Amber in August 2010, diagnosed Amber with anxiety disorder with a rule-out of intermittent explosive disorder. (Id. at 23-24). Brown testified that Denise wanted Amber to attend counseling, but Amber failed to attend. (Id. at 25-26). Brown testified that Amber attended a total of three (3) counseling sessions from August

9, 2010 until November 11, 2010. (Id. at 26-27). Brown testified that Amber missed two (2) scheduled counseling sessions, and they had not heard from Amber since September 21, 2010. (Id. at 28). Brown testified that she is concerned that Amber still has an untreated mental illness. (Id. at 29).

{¶22} On cross-examination, Brown testified that Amber tested negative for illegal substances on August 9, 2010 and at least two other times, and that substance abuse has never been a concern in Amber's case. (Id. at 30-31). Brown testified that Kring's August 12th diagnosis that Amber suffered from anxiety and intermittent explosive disorder was changed on August 26th to a diagnosis of anxiety. (Id. at 31-32). Brown testified that their records did not indicate whether Amber was taking medication for her anxiety. (Id. at 32-33). Brown testified that Amber had a history of attention deficit disorder but no current diagnosis of such. (Id. at 37). On re-direct, Brown testified that the diagnosis of record was made by the psychiatrist in 2008, who diagnosed Amber with major depression, recurrent, moderate with attention deficit disorder, post-traumatic stress disorder, and anxiety. (Id. at 39-40). Brown testified that Amber had been prescribed Lamictal, a mood stabilizer, Straterra for attention deficit disorder, and later those medications were changed to Depakote, a mood stabilizer, and Zoloft for depression. (Id. at 41). Brown testified that Amber stopped taking these medications in 2008. (Id. at 42). Brown testified that Amber was unable to

establish goals during her counseling sessions because she did not attend enough counseling sessions. (Id. at 42-43).

{¶23} Rebecca Schumaker, a former parent educator and current case worker at CPSU, testified that she was involved with Amber regarding her care of three of her children. (Id. at 44-45, 49). Schumaker testified that she began working with Amber and her daughter in May 2002 when Amber was fourteen or fifteen (14 or 15) years old. (Id. at 49-50). Schumaker testified that she worked with Amber on parent/child interaction, feeding, holding, and interacting with the baby, and they were monitoring the child's development. (Id. at 50). Schumaker testified that Amber contacted the agency again for services when she was pregnant with her second child in June 2006. (Id. at 51). Schumaker testified that there were concerns with Amber's care for her daughter, who was four years old and escaping from the home. (Id.). Schumaker testified that she was concerned about Amber's daughter escaping from the home because it was not an isolated incident, and Amber had not taken any action to stop it from re-occurring. (Id. at 52-53). Schumaker testified that Amber's home was "very cluttered," "piled with boxes of items," and "very chaotic" with Amber's mother, Kathy Welly, living there and bringing her boyfriend in and out of the home. (Id. at 54). Schumaker further testified that she had some concerns with Welly, because Amber had reported that Welly was an alcoholic and that they would engage in fist fights.

(Id.). Schumaker also was concerned with two other individuals living in the home: Eric McNarry, who had recently been released from prison after serving a term for domestic violence; and Robert Essex, Amber's sixty-year old boyfriend and father of two of Amber's children while still married to another woman. (Id. at 55).

{¶24} Schumaker testified that "[t]here was always so much drama that it was very difficult to look into the issue of parent education" with Amber. (Id. at 56). Schumaker testified that Amber was concerned with sex offenders possibly living in her apartment complex; nevertheless, Amber allowed her daughter to spend a month with Randy Hernandez, a family member she thought was a sex offender, and Alex Hernandez, a family member she thought had abused her children. (Id. at 56-57). Schumaker testified that Amber told her that someone was getting into her apartment through her attic, but the apartment management explained that that could not be possible because of fire walls in the attic between each apartment. (Id. at 57-58). Schumaker testified that Amber made an allegation that the apartment maintenance man was watching her because he wanted to have sex with her, when he was actually involved in ministry. (Id. at 59). Schumaker testified that Amber had several heated disagreements with the apartment complex's management about them allowing the maintenance man into her apartment when he just wanted to have sex with her. (Id. at 59). Schumaker

testified that Harold W., Amber's Uncle and registered sex offender, was babysitting the children the night the police removed Amber's two children from the home in August 2008. (Id. at 59-60). Schumaker testified that her visitations with Amber were "distorted" because Amber would continually make allegations against people. (Id. at 62). For example, Amber alleged that she had a video showing Essex's teenage daughter being sexually inappropriate with her daughter, but the video was actually a Care Bears video. (Id.). In 2007, Amber alleged that her son, who was one year old at the time, was able to walk out of the foster parents' home and walk to Amber's grandmother's house and put a magical spell on her grandmother. (Id. at 63). Schumaker testified that Amber fired her from the case in 2007, and that Amber had made very little progress throughout the case. (Id.). Schumaker testified that she attempted to work with Amber on the first case for almost two and a half (2.5) years, and the second case for a little over one (1) year with little progress due to Amber's inability to focus and her argumentative disposition. (Id. at 64). Schumaker testified that Amber received an "excessive" amount of parent education compared to that normally provided for dealing with the sorts of issues Amber manifested. (Id. at 67). Schumaker testified that Amber smacked her one-year-old child on the hands during a supervised visitation and remarked "[s]ometimes you gotta do what you gotta do." (Id. at 67-68).

Schumaker testified that Amber could not appropriately parent her children. (Id. at 69-70).

{¶25} On cross-examination, Schumaker testified that CPSU became involved in the case shortly after she began, and that her relationship with Amber began to deteriorate shortly after CPSU became involved. (Id. at 72). Schumaker testified that she would not be aware of any progress that Amber has made since October 2007. (Id. at 73). Schumaker testified that she was not certain whether Harold W. was watching the children when the police picked up the children at the home, but that she had concerns with all of Amber's uncles, who were either sex offenders or had prior criminal convictions. (Id. at 73-75). On re-direct, Schumaker testified that Harold W. was in the home after Amber was made aware of the fact that he was a registered sex offender, though he was not there with the children. (Id. at 78).

{¶26} Megan Lauck, a caseworker with HCJFS, testified that she was Baby Boy W.'s case worker since July 2010. (Id. at 81-83). Lauck testified that Amber thought the father of the child was "Dallas," a guy she previously attended high school with and had sex with during a party in Findlay, though she did not know Dallas's last name or his whereabouts. (Id. at 84-85). Lauck testified that Amber wanted her half-brother, Eric Welly, to be listed as the child's father, which Lauck thought would be confusing to the child. (Id. at 85-86). Lauck testified that Baby

Boy W. was in CPSU's temporary custody as of July 1, 2010 after his removal due to Amber's prior involuntary termination of her parental rights for two of Baby Boy W.'s siblings. (Id. at 87-88). Lauck testified that adoption was Baby Boy W.'s permanency goal. (Id. at 95). Lauck testified that Amber was involved in the case plan, and that the case plan's first objective was to establish paternity, but Amber was unable to provide any meaningful information to identify the father. (Id. at 97). Lauck testified that the case plan's second objective was to have Baby Boy W. assessed for developmental delays, which required a release form signed by Amber; however, Amber would not release the child's medical records to CPSU. (Id. at 99-105). Lauck testified that they had to obtain a court order to obtain the child's medical records so that he could be assessed for delays. (Id. at 105). Lauck testified that Baby Boy W. was delayed in every area but one. (Id. at 106). Lauck testified that the case plan's third objective was for the child to receive appropriate medical care, and Amber frustrated that objective by not cooperating in having the child assessed, even though Amber believed the child may have had Down syndrome and asked that he be assessed. (Id. at 107-08).

{¶27} Lauck testified that the case plan's fourth objective was visitation with the child. (Id. at 109). Lauck testified that she was concerned with Amber placing the child's pacifier in her mouth before placing it in the child's mouth, because she could transfer cold and flu germs to the child. (Id. at 111). Lauck

-15-

further testified that Amber would report suspected injuries to the child that were not, in fact, injuries. (Id. at 111). Amber also fed the child prior to his scheduled feeding time, which caused the child to spit up. (Id. at 112-14). Lauck testified that she witnessed Amber being hostile toward staff during visitation. (Id. at 114). Lauck testified that her July 19, 2010 home visit with Amber was confrontational, and Amber wanted to talk about how CPSU's case was unfounded. (Id. at 116-17). Amber told Lauck that Baby Boy W. was taken away because CPSU thought she was on drugs even though substance abuse was never CPSU's reason for the removal of the child. (Id. at 117). Lauck testified that she was concerned that Eric Welly and his girlfriend were living with Amber even though Amber stated they were not living in the home. (Id. at 118-19). Lauck testified that she attempted to visit Amber's home on August 11, 2010, but no one answered the door even though she could hear people inside the home. (Id. at 120). Lauck testified that her August 31, 2010 home visit was, again, confrontational and Eric Welly was in the home again with his girlfriend. (Id. at 121-22). During this visit, Amber again conveyed that she thought CPSU was taking her child because they thought she was on drugs. (Id. at 123). Amber also conveyed to Lauck that she thought CPSU became involved with her daughter because her daughter trashed her house. (Id. at 123-24). During another visitation, Amber expressed concern over a scratch on Baby Boy W.'s leg, but Lauck did not see any visible scratch on the child. (Id. at

125). During a home visit, Amber expressed concern that one of her friends, James Bush, was texting her and threatening to beat up Baby Boy W. (Id. at 129). Lauck testified that Amber had several reasons that the child should be removed from the foster home, including the alleged scratched leg, an alleged broken blood vessel in the child's eye, as well as Bush's alleged threats to the child. (Id. at 131).

{¶28} Lauck further testified that Amber requested that her father, her sister, her brother, and Sarah Miller be allowed to have visitation with Baby Boy W., but that they informed Amber that the visits were for *her* to bond with the child. (Id. at 132). Lauck testified that Harmony House eventually allowed Amber to bring one person, and she chose her brother, Eric Welly. (Id. at 133). Lauck testified that, on October 4th, Amber reported that the child had a large broken blood vessel in his eye; however, Lauck checked the child and observed no such injury. (Id. at 136-37). Lauck testified that Amber was not able to provide an adequate permanent home for the child. (Id. at 138). Lauck testified that Amber has not accepted responsibility for the removal of her two other children; rather, Amber blamed her daughter and everyone involved. (Id. at 139). Lauck testified that Baby Boy W. "seems to be content" with Amber, but that Baby Boy W. is "very bonded" to his foster parents. (Id. at 140). Lauck further testified that Baby Boy W. is "always a very happy baby when [he] goes [to the foster care home], smiling. He seems very happy and content. Healthy." (Id. at 140-41). Lauck

-17-

testified that she did not believe that Amber could provide a safe home environment because the house was not clean and the possibility of sex offenders being in the home. (Id. at 142). Lauck further testified that Amber still has rooms set up for her two other children who have been taken away permanently, because Amber believes she will be allowed visitation with the children. (Id. at 143). Lauck testified that Baby Boy W. would benefit from adoption, because he needs parents who would sacrifice their needs for his needs, and, specifically, parents that would follow-up with his medical needs. (Id. at 146). Lauck testified that Amber could not provide the care Baby Boy W. needs. (Id. at 146-47). Lauck testified that she did not believe the child could be returned to Amber even if the case plan was continued for another six to twelve (6-12) months. (Id. at 149).

{¶29} On cross-examination, Lauck testified that she repeatedly asked Amber to sign the paperwork so Baby Boy W. would get medical treatment, but Amber refused because "she didn't want him to receive services." (Id. at 166). Lauck testified that she would have talked with her supervisor or the prosecutor to change the case plan from seeking permanent custody had she witnessed changes in Amber's ability to parent since the previous termination of parental rights, but she did not witness Amber improve. (Id. at 173).

{¶30} Matt Stombaugh testified that he is a case manager at Open Arms Domestic Violence and Rape Crisis Services, which operates/manages the

-18-

Harmony House, a supervised visitation center. (Id. at 190-91). Stombaugh testified that he oversees all the cases at the Harmony House, and that he had facilitated visits between Amber and Baby Boy W. from July 28, 2010 to November 12, 2010. (Id. at 191-93). Stombaugh testified that, during the July 28th visitation, Amber told Baby Boy W. about his other siblings, who were permanently removed from Amber's custody, and Amber placed Baby Boy W.'s pacifier into her mouth and gave the pacifier back to Baby Boy W. after Baby Boy W. spit it out on the floor. (Id. at 195). Amber also voiced concern over bumps on the child's head, which Stombaugh examined and determined to be "[s]mall, reddish raised hair follicles. Nothing that [he] was overly concerned about." (Id. at 196). During the July 30th visitation, Amber claimed that Baby Boy W. had scratches on his face; she kissed Baby Boy W's hands and said, "don't scratch yourself"; Baby Boy W. started crying, and Amber said, "see, you made yourself cry"; Amber then said she needed to find mittens for the child. (Id. at 197). During the August 4th visitation, Amber, again, asked about the bumps on Baby Boy W.'s head, and those bumps were again determined to be "just raised hair follicles, just maybe just a section of goose bumps that didn't go down." (Id. at 198-99). Stombaugh testified that Amber was late for her August 13th and 18th visitations. (Id. at 199-200). During the August 18th visitation, Amber: told Baby Boy W. that his brother and sister said they loved him; expressed concern over

Baby Boy W.'s red eye, which was inspected and determined to be only a slight irritation; and  fell asleep. (Id. at 200-02).  Stombaugh testified that Amber's recorded voicemail message states that "you've reached [Amber] and all of her children's names." (Id. at 201).  Stombaugh testified that Amber also fed Baby Boy W. early and rapidly without burping him, contrary to staff's advice, and the child threw-up. (Id. at 202-04).  Amber was late for the September 10th visitation and refused to feed the child formula that was prepared by the foster parents. (Id. at 205).  Stombaugh testified that Amber was very argumentative and refused to feed the child even though the child was hungry. (Id. at 206-07).  Amber was also late for the September 17th visitation and violated Harmony House policy by bringing an unapproved guest, being hostile toward staff, and being inappropriate in the child's presence. (Id. at 208).  During that visitation, Amber: argued with Stombaugh about her placing the child's pacifier into her mouth and giving it back to the child; removed Baby Boy W.'s clothing for most of the visit, even though the child was appropriately dressed for the temperature; and, again, reported redness with the child's eyelid, which was a minor irritation. (Id. at 209-12).  During the September 24th visitation, Amber was reminded not to talk with the monitors, since the visitation was for her to bond with her child. (Id. at 213-14).  With respect to feeding Baby Boy W., Stombaugh testified that Harmony House actually removed the child's bottle from Amber, so that they could control the

correct feeding times, which was the first time Stombaugh had ever had to do that with a parent. (Id. at 216-17).

{¶31} On cross-examination, Stombaugh testified that Amber arrived to visitation several times before the foster parents had arrived with the child. (Id. at 222-23). Stombaugh testified that Amber was four minutes late at most. (Id. at 224). Stombaugh testified that Amber correctly noticed that the child's bottle was dirty on two occasions, when a small piece of food or lettuce was stuck inside the bottle. (Id. at 235-36). Stombaugh testified that Amber did not want to feed the formula to the child because she expressed concern about a recall on the formula; however, Stombaugh testified that he informed Amber that the recall was not for the formula the foster parents were using. (Id. at 237). Stombaugh testified that Amber attended twenty-nine (29) of thirty-two (32) possible visitations, and that Amber cancelled two visitations, while the foster parents cancelled one. (Id. at 238). Stombaugh testified that they do not teach the parents how to interact with their children, though they may suggest different ideas. (Id. at 240-41). On re-direct, Stombaugh testified that Amber placed the child's pacifier into her mouth and then into the child's mouth approximately twenty-two (22) times prior to the September 17th visitation, and she was reminded once thereafter not to do so. (Id. at 244-45).

{¶32} Following Stombaugh's testimony, the State rested, and the defense called Sarah Miller to the stand. (Id. at 249-50). Miller testified that she had been employed as a social worker at the Caughman Health Center in Findlay for the past year and a half. (Id. at 250-51). Miller testified that Amber contacted her in February 2010 to set up transportation to Maternal Fetal Medicine in Toledo because she was pregnant. (Id. at 251-53). Soon thereafter, Amber began attending a monthly half-hour support and education group for pregnancy and parenting issues that Miller facilitated. (Id. at 253-55). Amber attended six (6) or seven (7) of these meetings, and Amber participated very heavily and appropriately in the group's discussions. (Id. at 254-55). Miller testified that she had some concern about why Amber did not have her children and had concern about the circumstances surrounding CPSU's removal of Amber's children. (Id. at 255-56). Miller testified that she contacted Amber's caseworker, Megan, to better understand CPSU's prior involvement, and Megan informed her that Baby Boy W. was removed from Amber because of CPSU's prior involvement with Amber. (Id. at 256-57). Miller testified that she was aware that Amber was not required to have services under a case plan, but she offered services to Amber nonetheless. (Id. at 257-58). Amber declined mental health services from Miller, because Amber said she was already receiving services from Century Health, but Amber did participate in parenting support services. (Id. at 258-59). Miller testified that,

-22-

as part of the parenting support services, Amber met with her one half hour weekly. (Id. at 259). Miller testified that they discussed attachment to the child, perceptions of being a mother, discipline, and strategies of self-care. (Id. at 260). Miller further testified that Amber would complete homework worksheets and was doing very well. (Id. at 260). Miller testified that she did not discover any concerns with Amber during the five (5) weeks she spent with her, and that Amber was "very compliant" with her prenatal care. (Id. at 260-61). Miller testified that Amber was benefiting from the services at Help Me Grow, and that Amber understood that CPSU was seeking permanent custody, though Amber believed there might be a chance at reunification. (Id. at 262-63). Amber also told Miller that she would sign the release so that Baby Boy W. could participate in services. (Id. at 263-64). Amber indicated that, initially, she did not want to sign the release form because the form had Baby Boy W.'s social security number on it. (Id. at 267). Miller testified that she could not determine whether or not Amber could parent since she did not see Amber interact with her child, but Miller testified that Amber did express how to appropriately parent during the time she worked with her. (Id. at 268).

{¶33} On cross-examination, Miller testified that she started the parenting support group, called Mothers Offering Mothers Support (MOMS), in January 2010 as a new group. (Id. at 271). Miller testified that Amber attended a total of

-23-

eleven (11) hours of group parenting counseling and seven and one half (7.5) hours of individualized parenting services. (Id. at 273-74). Miller testified that she did not attend a visitation at the Harmony House, because Amber informed her that she could not attend. (Id. at 276). Miller was unaware that Harmony House allowed Amber to bring in one of five approved people to visitation, and that she was one of those approved. (Id. at 276-77). Miller testified that she has never seen Amber actually implement anything she learned through the parenting classes. (Id. at 279). Miller testified that she was not aware that CPSU provided Amber with over two and a half (2.5) years of parenting education, or that Amber alleged that her older son was casting magical spells. (Id. at 280). Miller testified that she was not aware of Amber's anger issues and did not witness any anger issues with Amber. (Id. at 282). Miller testified that she thought it odd that Amber wanted her brother listed as the father of the child on the birth certificate, though she thought Amber's intentions were good. (Id. at 285). Miller testified that she thought Amber's parenting education was "very easy because she's extremely open to feedback, she's very cooperative, very compliant." (Id. at 286). Miller testified that Amber's individualized parenting goals were collaboratively developed between Amber and her. (Id. at 290). Miller testified that Amber acknowledged that she made a poor decision to leave her older children with her uncle, who allowed the children to escape the home. (Id. at 294). Amber also told Miller that

-24-

she thought CPSU was involved in the case because of the children's father, Robert Essex. (Id. at 295). On re-direct examination, Miller testified that Amber was not confrontational during their counseling sessions, and that Amber was a very appropriate participant. (Id. at 296-97). Miller found Amber "very enjoyable to work with" and "not challenging to work with." (Id. at 297).

{¶34} Amber testified that she resides alone in a three-bedroom, bath and a half, in Findlay, Ohio. (Id. at 299-300). Amber testified that her daughter's room is still set up, because she still has rights to her. (Id. at 300). Amber testified that she learned she was pregnant October 31st, and that in January or February they discovered Baby Boy W.'s weight was low. (Id. at 302-03). Amber testified that he also tested positive for Down syndrome at that time, so she met with Miller to arrange transportation to the Maternal Fetal Hospital in Toledo, where she had weekly appointments. (Id. at 303). Amber testified that she began attending the MOMS class in February once a month, and that she did twelve (12) parenting class sessions during 2008 to 2009 through FRC. (Id. at 304). Amber testified that she learned about nutrition and massage at the MOMS classes, and that she attended six or seven (6 or 7) of these classes. (Id. at 305). Amber testified that Baby Boy W. was diagnosed with Down syndrome, had a low weight, and was born "5-6, 18 inches." (Id. at 306-07). Amber testified that CPSU took the baby shortly after delivery; that the nurse told her that CPSU believed she was on drugs;

and that CPSU did not tell her why they were taking the child. (Id. at 308-09). Amber testified that she had her brother and his girlfriend present when case workers visited her house, because she wanted witnesses to hear what was being said since case workers had told her and Robert Essex different things in the previous case. (Id. at 310-11). Amber testified that she worked with Lauck on a case plan, but that Lauck never informed her what she could do to have Baby Boy W. returned, so she sought parenting services on her own. (Id. at 311). Amber testified that she completed a mental health assessment and a substance abuse assessment, and there were no recommendations as a result of either assessment. (Id. at 312-13). Amber testified that she visited Baby Boy W. at the Harmony House, and that the appointments went well, except that the staff did not let her feed Baby Boy W. when he was hungry. (Id. at 315-16). She testified that she missed three (3) visits, and she put the pacifier in her mouth after it fell on the floor because "[she]'d rather [herself] get sick than [her] four 4-month old get sick." (Id. at 316-17). Amber testified that she did not sign the release form because it had Baby Boy W.'s social security number on it, and she did not feel comfortable releasing that information. (Id. at 320). Amber further testified that she did not want to share therapy records, evaluation goals, or IFSP reports with CPSU, because she thought they would use the information against her. (Id. at 322). Amber did not believe that this would affect her child's ability to receive

care. (Id. at 323). Amber testified that she would follow CPSU's requests, and that she was "doing what [she could] to get [her] son." (Id. at 326).

{¶35} On cross-examination, Amber testified that, before she delivered the child, she did not think that CPSU would be involved. (Id. at 327-28). Amber testified that she did not know the father's whereabouts, but that she "seen him in passing" from Findlay High School where she graduated from in 2005. (Id. at 328-29). Amber testified that she wanted her brother to be on the child's birth certificate because he had been there for the child, and that she was going to tell Baby Boy W. that her brother was his uncle. (Id. at 329). Amber testified that she did not see any relationship between her wanting her brother on the birth certificate and her parenting skills. (Id. at 330). Amber testified that her brother, Eric, would be a good role model for the child even though Eric was recently released from prison. (Id. at 332). Amber testified that she has had three prior cases with CPSU, and that she worked with CPSU on the case plans, though she did not finish parenting classes. (Id. at 333, 336). Amber testified that she "had no clue" why Schumaker would testify that she told her that her son was casting spells. (Id. at 340). Amber testified that it was not her fault her other children were taken away but because "JFS likes to lie a lot and they thought they were running the Court." (Id. at 344). Amber testified that she collects SSI payments for a developmental handicap. (Id. at 345). Amber acknowledged that she testified

at the July 8, 2010 shelter care hearing that she was not willing to work with CPSU, but testified here that she was willing to work with CPSU "as long as we don't have no chaos like the last time." (Id. at 346-47). Amber testified that she wanted Baby Boy W. removed from the foster home after discovering the dirty bottle and his irritated eye. (Id. at 353). Amber also testified that she disagrees with the Harmony House concerning when to feed the child, because the child was hungry when she wanted to feed him. (Id. at 354). Amber testified that she sought anger management on her own, and that Brown lied when she testified that she was not in the anger management group. (Id. at 359-60).

{¶36} Don Schmidt, a CASA representative, testified that he had been involved with Amber's first case in 2005 to 2006. (Id. at 380-81). Schmidt testified that he recommended that CPSU be granted permanent custody of Baby Boy W., so that the child could be adopted. (Id. at 382). Schmidt testified, on cross-examination, that he did not have any contact with Amber regarding Baby Boy W. since Amber "fired him." (Id. at 383). Schmidt testified that he was confident in his recommendation despite not having done an independent evaluation. (Id. at 384).

{¶37} After reviewing the evidence presented, the trial court concluded that the State had clearly and convincingly demonstrated that the child cannot be placed with Amber. (Nov. 22, 2010 JE, Doc. No. 39). We agree. Amber

*stipulated* that she had her parental rights involuntarily terminated with respect to two of Baby Boy W.'s siblings, and the trial court found that Amber had failed to demonstrate any improvement since the previous termination of her parental rights. (Id.). Under these circumstances, R.C. 2151.414(E)(11) applied, and as such, the trial court was required, pursuant to R.C. 2151.414(E), to find that the child should not be placed with Amber.

{¶38} Next, the trial court determined that it was in the child's best interest to award CPSU permanent custody. (Id.). The trial court stated that it had considered the factors set forth in R.C. 2151.414(D)(1) for purposes of determining the best interest of the child, which factors are:

> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;**

**(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

(Id.).    Pursuant to R.C. 2151.414(D)(1)(e), the trial court noted that R.C. 2151.414(E)(11) was, again, applicable, since Amber's parental rights had been previously involuntarily terminated, and Amber had failed to demonstrate any improvement since the previous termination of her parental rights, despite Miller's favorable report. (Id.).  The trial court further noted that Amber was "resistant to any help by the agency or in receiving much needed parent education or mental health counseling," and that, after spending more than two and a half (2.5) years working with Amber, Shumaker concluded that Amber "simply cannot parent." (Id.).

{¶39} The trial court's findings herein were supported by competent, credible evidence by which it could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights had been established. R.C. 2151.414(B); *In re Forest S.*, 102 Ohio App.3d at 344-45; *Cross*, 161 Ohio St. 469, at paragraph three of the syllabus.  As an initial matter, we have already noted that Amber stipulated that her parental rights had previously been involuntarily terminated and failed to demonstrate that she could provide a legally

secure permanent placement and adequate care for the health, welfare, and safety of the child, and therefore, R.C. 2151.414(E)(11) was applicable. (Nov. 15-16, 2010 Tr. at 10-12); (CPSU Exs. 5-6). The only evidence that Amber remedied the circumstances leading to her prior termination of parental rights was Miller's favorable testimony; however, the trial court found Miller's testimony less than persuasive. (Nov. 22, 2010 JE, Doc. No. 39). Although the trial court failed to state why it found Miller's testimony lacking, it is probably because Miller's testimony was based upon only eighteen and a half (18.5) *hours* she worked with Amber; whereas Schumaker's testimony, for example, was based upon over two and a half (2.5) *years* of working with Amber. Furthermore, although not specifically relied upon by the trial court, Brown's testimony indicated that Amber had chronic mental or emotional illnesses for which she refused to follow recommended treatment and which hindered her ability to properly care for her children. See R.C. 2151.414(E)(2). Additionally, although not relied upon by the trial court, Lauck testified that Amber *in effect* withheld medical diagnosis and treatment of Baby Boy W. by failing to timely provide CPSU with a signed release form. Amber's reason for withholding her consent stemmed from her general distrust of CPSU, but Amber's action demonstrates her failure to put Baby Boy W.'s interests above her own. See R.C. 2151.414(E)(8).

{¶40} With respect to R.C. 2151.414(D)(1)(b), the child's representative recommended that CPSU be granted permanent custody of the child. The testimony also indicated that granting CPSU permanent custody so that the child could be adopted was necessary for the child to have a legally secure permanent placement. R.C. 2151.414(D)(1)(d). For example, Lauck testified that she did not believe the child could be returned to Amber even if the case plan was continued for another six to twelve (6-12) months. (Nov. 15-16, 2010 Tr. at 149). With respect to R.C. 2151.414(D)(1)(a), Lauck testified that the child's interactions with his foster caregivers was very favorable, while the child was "content" with Amber. (Id. at 140-41). Finally, with respect to R.C. 2151.414(D)(1)(c), the record indicates that the child was in CPSU's temporary care since birth and was never with Amber except for supervised visitation at the Harmony House. In light of this record, we cannot conclude that the trial court's decision to award CPSU permanent custody was based upon insufficient evidence or against the manifest weight of the evidence as Amber argues.

{¶41} Amber's second assignment of error is, therefore, overruled.

{¶42} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, P.J. and SHAW, J., concur.**

**/jlr**