[Cite as *In re R.R.*, 2014-Ohio-5579.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN THE MATTER OF:

R.R.

Appellate Case No.    26305

Trial Court Case No.   2012-5793

(Juvenile Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of December, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. #0020084, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Appellee, Montgomery Co. Dept. Of Job & Family

D. JASON HALSEY, Atty. Reg. #0091643, 733A Residenz Pkwy., Kettering, Ohio 45429
        Attorney for Appellant, S.M.

JEFFREY LIVINGSTON, Atty. Reg. #0062466, 120 West Second Street, Suite 2000, Dayton, Ohio 45402
        Attorney for Mother, S.R.

 KATHRYN BOWLING, Atty. Reg. #0084442, 111 West First Street, Suite 518, Dayton, Ohio

45402
    Attorney for Minor Child, R.R.

CYNTHIA WESTWOOD, 2160 Kettering Tower, Dayton, Ohio 45423
    Guardian Ad Litem

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    Appellant, S.M., appeals from a judgment granting legal custody of a minor child, R.R., to the child's biological mother, S.R.[1]    In support of her appeal, S.M. contends that the trial court decision, which found R.R. to be an abused child, was against the clear and convincing weight of the evidence.    S.M. also contends that the trial court's finding of dependency was against the manifest weight of the evidence.    Finally, S.M. contends that the trial court committed reversible error in proceeding directly to disposition after adjudication, without obtaining the parties' consent.

{¶ 2}    We conclude that the abuse and dependency findings are not against the manifest weight of the evidence. In addition, the trial court did not err in proceeding to disposition on the same day the adjudication hearing was held.    The parties were aware of the court's intent to proceed, and, at a minimum, impliedly agreed to proceed with disposition.    Furthermore, the court continued the dispositional hearing for two months, at which time the parties were able to present additional testimony on the merits.    As a result, any error would have been harmless.    Accordingly, the judgment of the trial court will be affirmed.

---

[1]    To protect the privacy of the minor child, we will use initials instead of the names of the parties.

## I. Facts and Course of Proceedings

{¶ 3} On July 24, 2012, the Miamisburg, Ohio Police Department notified Montgomery County Children Services (MCCS) about the alleged physical abuse of R.R., a thirteen-year old child. As a result, MCCS sent an after-hours caseworker, Dawn Alsept, to an apartment where R.R. was living with S.M. Initially, S.M. told Alsept that she was the child's mother. Well into discussions with S.M., Alsept found out that was not correct, and that S.M. was a non-relative who had legal custody of R.R.

{¶ 4} Alsept's customary procedure is to step outside the premises to speak with alleged victims, but S.M. would only let Alsept speak with R.R. inside the apartment. Alsept observed injuries on the child's right forearm and upper arm, including a dime-sized mark where the skin was broken open. S.M. admitted having hit R.R. on the arm with a belt because R.R. failed to write 25 scriptures. S.M. stated that she could not recall how many times she hit R.R.

{¶ 5} Although Alsept was originally called about physical abuse, she noticed several things about the apartment that were unusual. A camera was mounted in the living room, facing the door; however, the apartment was so small that the camera's range appeared to encompass the entire living and kitchen area. The living room was also very sparsely furnished, and contained only a bed, a small computer stand, and a tiny table. The living room did not contain any personal effects, other than a computer and a book. In addition, cameras were also located in the bathroom and on the outside of the apartment door, facing the hallway.

{¶ 6} When Alsept asked S.M. about the cameras, S.M. stated that R.R. was looking at things on the computer that were inappropriate. R.R., therefore, was no longer allowed to have her own space and had to be in the living room rather than a bedroom. The apartment had

two bedrooms. One bedroom was padlocked, and when S.M. unlocked it, Alsept saw what appeared to be almost a command center type of situation. A large computer screen was divided into sections reflecting the various camera views that showed different parts of the apartment. One area was the living room; another was the hallway outside the apartment, and one was in the bathroom, where the camera was mounted in such a way that the entire bathroom was observable, including the toilet, sink and shower. When Alsept looked at the camera feed, she could see the toilet, sink, and inside the shower curtain, to the bottom of the tub. Thus, there was no way to toilet or bathe without being on video.

{¶ 7} Alsept asked if there was a concern that R.R. was doing anything to harm herself or others, and S.M. said no. S.M. indicated that she could access the cameras remotely, and check on R.R.

{¶ 8} When Alsept asked about R.R.'s biological family, S.M. said they were not involved. R.R. was also home-schooled. Alsept thought R.R. seemed very isolated, and asked S.M. if R.R. were able to get out much. S.M. then said, "Is it illegal for her to be in these four walls? She has a window. She can see outside." Trial Transcript, Vol. I, p. 28.

{¶ 9} When Alsept examined R.R., she also observed light welts on her back. Due to concerns over the amount of physical discipline, lack of interaction, extreme supervision, and the child's overall well-being, MCCS physically removed R.R. and placed her with J.E., who had been identified by S.M. as a "spiritual sister" and appropriate caretaker.

{¶ 10} A pre-placement hearing was held on July 27, 2012, at which time the agency decided to leave the child with J.E. However, MCCS subsequently learned that its safety plan was violated without its knowledge, when J.E. allowed S.M. to retrieve the child on July 28,

2012.

{¶ 11} MCCS caseworker, Rhonda Hicks, was assigned to the case on July 25, 2012. Hicks interviewed S.M. on August 2, 2012, and S.M. asked Hicks how long she had to refrain from using physical discipline, i.e., if she had to refrain only while the case was pending. S.M. stated that she planned to continue to use physical discipline but would be more cautious in the future.

{¶ 12} On numerous occasions, Hicks and S.M. discussed the need for the cameras. The only answer S.M. ever provided was that she was making sure R.R. was not doing anything she was not supposed to do, or was masturbating. S.M. never specifically said what R.R. had done in the past, and denied to several MCCS staff members that R.R. was harming herself or had engaged in worrisome behaviors. However, during a later intra-agency appeals process, S.M. stated for the first time that R.R. had started a fire. S.M. also made this statement during the dispositional hearing.

{¶ 13} The bathroom camera was a particular concern, and was discussed with S.M. several times. S.M. indicated that part of her spiritual beliefs involved making sure that R.R. was not masturbating in the bathroom. S.M. did not say that she had ever actually found R.R. masturbating. When questioned about R.R.'s right to at least some privacy, S.M. responded, "But she's a child, why does she need privacy?" Trial Transcript, Vol. I, p. 69.

{¶ 14} MCCS also had also received allegations dating back to 2008, in which R.R. had reported physical and sexual abuse by S.M. However, as soon as MCCS was able to get involved and interview R.R., she recanted. R.R. appeared to be very fearful of S.M., and acted differently when S.M. was present. When S.M. was present, R.R. was very guarded and stiff;

when S.M. was not present, R.R. acted like an average child and was relaxed. When R.R. was placed in foster care, she was "bubbly," like she was going on vacation. This was not at all typical behavior for a child being separated from a parent.

{¶ 15} On August 7, 2012, MCCS filed a complaint for abuse, neglect, and dependency, and asked for interim temporary custody of R.R. The trial court granted interim temporary custody to MCCS and also appointed both a guardian ad litem (GAL) and separate counsel for R.R.

{¶ 16} During the course of its investigation, MCCS was able to locate R.R.'s biological mother, S.R., who was living in Columbus, Ohio. S.R. had given birth to R.R. in 1999, and had then entered into a relationship with S.M. when R.R. was around three years old. From that time until 2005, S.R. and S.M. lived together with R.R. as a family. When the couple broke up, S.R. decided to move to Columbus, Ohio. Because R.R. did not want to leave her public school in Dayton, Ohio, S.R. signed papers in March 2006, giving S.M. what she thought was temporary custody of R.R., in order that the child could be kept in school. For a year or two, S.R. came to Dayton on weekends to see R.R. According to S.R., after S.M. found out in 2008 or 2009 that S.R. was serious about another woman, S.M.'s telephone was disconnected and all communication ceased until November 2011. Prior to the loss of contact, S.R. had told S.M. that it was time for R.R. to move back in with her, but S.M. refused.

{¶ 17} In November 2011, both S.R. and S.M. attended a child support hearing. According to S.R., S.M. apologized after the hearing for taking R.R. away from her, and offered to let her see the child. S.R. indicated that her prior failure to see her daughter was not because she did not want to see the child; instead, she did not know where R.R. and S.M. were. In

addition to the phone disconnection, the evidence indicated that S.M. and R.R. had moved several times in the span of a few years.

{¶ 18}  Between November 2011 and April 2012, S.M. allowed S.R. to see her child about four times, but S.M. dictated when the visits and any other communication could take place.  Things began to deteriorate again after April 2012, when S.R. questioned S.M. about the home schooling and some things that R.R. had told her.  In order not to lose contact again, S.R. went along with whatever decisions S.M. made.

{¶ 19}  At an adjudicatory hearing held on October 18, 2012, a magistrate found that R.R. was an abused child under R.C. 2151.031(B) and (D), and was dependent pursuant to R.C. 2151.04(B) and (C).  The magistrate also concluded that R.R. was not neglected, nor was she abused under R.C. 2151.031(C).  After making these findings, the magistrate went on to briefly hear evidence relating to disposition.

{¶ 20}  Prior to the hearing, the GAL had filed reports expressing concern about S.M.'s contact with R.R., which upset R.R..  In addition, S.M. made negative remarks about R.R.'s biological mother, referring to her as "the enemy."   S.M. also appeared to be attempting to manipulate R.R.  On the other hand, R.R. appeared to enjoy her visits with S.R.  As a result, the magistrate primarily focused on visitation issues during the dispositional hearing on October 18, 2012.  After hearing from the ongoing caseworker, who discussed the negative effects of S.M.'s visitation, the magistrate concluded that S.M.'s visitation and telephone contact with R.R. would be suspended for the time being.  The magistrate then set a full day dispositional hearing for December 21, 2012.

{¶ 21}  At the subsequent dispositional hearing, the magistrate heard evidence from

Dionne Allen, the ongoing MCCS caseworker; J.E., who testified on behalf of S.M.; S.M., who testified against her attorney's advice; and S.R. In addition to the facts previously mentioned, S.M. testified that the cameras were placed in the home due to safety concerns for R.R. According to S.M., R.R. had attempted suicide three times and had done things in the home that were not appropriate, like setting a rug on fire. However, S.M. never sought counseling for R.R.; instead, she used prayer and fasting to address the issues. She also felt therapy was ineffective because she was dissatisfied with therapy R.R. had received at age seven, when R.R. had allegedly attempted to kill S.M. with a knife.

{¶ 22} S.M. also denied having had remote access to the video camera system, and denied that R.R. could be seen in the shower. In addition, S.M. denied (contrary to R.R.'s statements) that she had ever punched or choked R.R. She did admit to having slapped R.R. on the arm, bottom, and face as disciplinary techniques before July 24, 2012. S.M. further admitted to a domestic violence conviction in 2003 involving another party, and to having suffered from depression and mental health issues. According to S.M., she had attempted suicide twice as a juvenile and once as an adult. She was admitted as a juvenile for psychiatric treatment.

{¶ 23} According to S.M., she had left the apartment around 10:30 a.m. on the day of the alleged assault, to go to the gym. In the summer, S.M. normally got R.R. up around 8:00 a.m. to do her scripture writing, which took about 45 minutes. R.R. was then to start her school work about 9:30 or 10:00 a.m. S.M. returned home about two hours later, and checked on R.R.'s progress with her assignments. In checking the video tapes in the "command center," she discovered that R.R. had talked to a neighbor friend through the door, and that R.R. had not done her class assignments. R.R. also had not turned in her scriptures. S.M. stated that she felt

"desperate" and hopeless with R.R. She then struck R.R. three times on the arm with a belt. S.M. stated that R.R. stood there and "took it," and did not cry out (although S.M. also testified that the police had been called because a neighbor reported hearing a child screaming.)

{¶ 24} During the pendency of the case, S.R. had been picking R.R. up for weekend visits, and had been transporting her to Columbus, Ohio. The visits had gone well, and home studies had been done of S.R.'s home, resulting in a finding that S.R.'s home was appropriate. At the time of the hearings, S.R. was in college, studying early childhood education, and had been employed at a call center for several years. Prior to the second hearing, the GAL had also filed an updated report, recommending that legal custody be given to S.R., with MCCS retaining protective supervision for six months.

{¶ 25} After hearing the testimony, the magistrate ordered that S.R. be given legal custody, and that MCCS retain protective supervision for six months. The magistrate also ordered that S.M.'s contact with R.R. must be approved by both R.R. and her therapist.

{¶ 26} S.M. objected to the magistrate's decision, and her objections were overruled in part and sustained in part in June 2014. The magistrate's decision was modified to indicate that R.R. was not dependent under R.C. 2151.04(B) because MCCS was no longer attempting to reunify the child with S.M. In all other respects, the trial court agreed with the magistrate's decision, and ordered that legal custody be given to S.R., with six-months' protective supervision by MCCS. S.M. now appeals from the judgment finding that R.R. was abused and dependent and awarding legal custody to S.R.

II. Abuse Finding

**{¶ 27}** S.M.'s First Assignment of Error states that:

The Trial Court Committed Reversible Error in Finding and Adjudicating the Child Abused as that Finding Was Against the Clear and Convincing Manifest Weight of the Evidence.

**{¶ 28}** Under this assignment of error, S.M. contends that the abuse finding was not supported by clear and convincing evidence. As was noted, the trial court concluded that R.R. was an abused child under R.C. 2151.031(B) and (D). This statute provides, in pertinent part, that:

As used in this chapter, an "abused child" includes any child who:

* * *

(B) Is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abused child;

* * *

(D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare.

**{¶ 29}** In concluding that R.R. was abused for purposes of R.C. 2151.031(B), the trial court relied on R.C. 2919.22(B)(4), which states that:

No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

* * *

(4) Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development * * *.

{¶ 30} "A finding of abuse or dependency must be supported by clear and convincing evidence." *In re Butcher*, 5th Dist. Tuscarawas No. 2005 AP 05 0032, 2005-Ohio-3816, ¶ 26, citing R.C. 2151.35(A). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 31} The Tenth District Court of Appeals has noted that:

In determining whether the trial court's ruling * * * is against the manifest weight of the evidence, we must consider whether the evidence on each element of the agency's case "satisfied or failed to satisfy the burden of persuasion," i.e., whether clear and convincing evidence supports each element. *See Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 11, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19. A judgment " 'supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.* at ¶ 10, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. " 'The phrase "some competent, credible evidence" * * * presupposes evidentiary weighing by an

appellate court to determine whether the evidence is competent and credible.' "

(Emphasis sic.)   *Id.*, quoting *Eastley* at ¶ 15.

*In re C.G.*, 10th Dist. Franklin Nos. 13AP-632, 13AP-653, 2014-Ohio-279, ¶ 30.

**{¶ 32}**   After making these comments, the court of appeals also observed that:

" 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.   * * *   Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' "   (Emphasis deleted.)   *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).   "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way."   *Sparre* at ¶ 10, citing *Eastley* at ¶ 20.

"In undertaking this limited reweighing of the evidence, however, we are guided by the presumption that the factual findings of the trial court were correct."   *Sparre* at ¶ 12.   "Accordingly, the weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact."   *Id., citing State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.   The rationale for this deference is the trier of fact is in the best position to view witnesses and observe their demeanor, voice inflections, and gestures.   *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).   Moreover,

though sufficiency and manifest weight are different legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *See State v. Howze*, 10th Dist. No. 13AP-386, 2013-Ohio-4800, ¶ 10.

*C.G.* at ¶ 31-32.

{¶ 33} In disputing the evidence of abuse, S.M. contends that the video monitoring was not discipline, but was monitoring "used to restrain behavior." Appellant's Brief, p. 10. S.M. also contends that the caseworkers' testimony about the child's reaction to S.M. and changes in her behavior when S.M. was present were based on limited interactions and outward physical reactions that were not proven to have resulted from S.M.'s alleged abuse. Finally, S.M. argues that no mental health testimony was submitted, and that, in fact, the intake worker testified that the child's demeanor changed for the positive when she learned that she might be returned to S.M.

{¶ 34} We disagree with S.M., and find more than sufficient evidence to sustain the trial court's decision. The physical punishment is concerning, but even more troubling are the video surveillance to which R.R. was subjected even in her most private moments, and the isolation and virtual imprisonment of R.R. in her own home. Although S.M. argues that monitoring was done to restrain behavior, rather than to "discipline," we fail to see the distinction. All of S.M.'s actions, including monitoring R.R.'s movements, isolating R.R. from others, forcing R.R. to live and sleep in a barren environment, and using physical force, were used to intimidate and control R.R. Various individuals who interacted with the child testified to the marked differences in the child's behavior when S.M. was present and when S.M. was

absent.

{¶ 35}    Furthermore, the example cited of the positive improvement in R.R.'s demeanor when she learned of the possibility of being returned to S.M., misstates the evidence.   Rather than being a positive indicator, the example actually supports the fact that R.R. was very fearful of S.M.   Specifically, during the testimony of MCCS caseworker, Rhonda Hicks, the following exchange occurred:

Q.   And you've mentioned a level of control several times.   Could you just elaborate why that is a concern for the Agency in terms of [R.R.'s] well being?

A.   Because I don't think [R.R.] – we have allegations that date back since 2008 where [R.R.] has disclosed allegations of physical and sexual abuse by S.M.   But, as soon as we were able to get involved and interview [R.R.], [R.R.] recants.   And I have seen that firsthand when I interviewed [R.R.] on the second [of August 2012].   The first thing she wanted to know at the end of the interview, where was she going, was she leaving with [S.M.] And when I told her most likely so, everything – her demeanor changed, and I could have said the sky was blue, and she would have said it was red.   Just everything was very flat, everything was perfect in her life.   She seemed fearful to – rock the boat, to tell me anything.

Q.   After you indicated on the second that she may be returned to [S.M.'s] care, did she continue to answer your questions verbally?

A.   She did.

Q. Did she ever shrug her shoulders or not really answer any of your questions directly?

A. No. She – she had no concerns. She – the use of physical discipline was okay with her, the cameras were okay. Everything was fine.

Trial Transcript, Vol. I, pp. 79-80.

{¶ 36} These observations do not necessarily indicate that R.R.'s demeanor changed for the better. To the contrary, in these circumstances, the finder of fact may find that R.R. was a child who feared the consequences and punishment that would ensue if her potential caretaker learned that she had said anything negative about the caretaker.

{¶ 37} We have reviewed the entire record, and find that the trial court's findings of abuse under R.C. 2151.031(B) and (D) are not against the manifest weight of the evidence. Accordingly, the First Assignment of Error is overruled.

## III. Dependency Finding

{¶ 38} S.M.'s Second Assignment of Error states as follows:

The Trial Court Committed Reversible Error in Finding and Adjudicating the Child Dependent as that Finding Was Against the Manifest Weight of the Evidence.

{¶ 39} Under this assignment of error, S.M. contends that the trial court erred in finding R.R. dependent under R.C. 2151.04(C) because the greater weight of evidence shows that R.R. was receiving proper care and that the home's condition or environment had no ill-effect on R.R.

**{¶ 40}** R.C. 2151.04(C) provides that a " 'dependent child' means any child * * * [w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship * * *." As with abuse findings, dependency findings "must be supported by clear and convincing evidence." (Citation omitted.) *In re S.A.*, 2012-Ohio-3394, 974 N.E.2d 1261, ¶ 25 (2d Dist). Our review in these situations "is limited to determining whether the record contains sufficient credible evidence to support the trial court's decision." (Citation omitted.) *Id.*

**{¶ 41}** In challenging the dependency finding, S.M. first argues that the physical punishment on July 24, 2012 was not sufficient to substantiate "abuse." In addition, S.M. maintains that the State failed to show that the video surveillance created an environment that had an ill effect on R.R. In this regard, S.M. contends that the case before us is similar to *In re M.H.*, 9th Dist. Wayne No. 09CA0028, 2009-Ohio-6911.

**{¶ 42}** As an initial matter, we note that a finding of physical abuse is not required to establish "dependency" under R.C. 2151.04(C). Therefore, it is irrelevant whether corporal punishment amounting to abuse was established. Furthermore, the evidence in *M.H.* is not similar to the evidence in the case before us. In *M.H.*, there were allegations of sexual abuse that were found unsubstantiated by the trial court. *Id.* at ¶ 30. These unproven allegations constituted the only basis for the agency's claim of dependency. *Id.* In fact, the only problems that appeared to exist in *M.H.* were caused by the agency's improper removal of a child from the home and the placement of the child in foster care. *Id.* at ¶ 19-30. Under the circumstances, the court of appeals concluded that the agency "failed to prove its case by clear and convincing evidence." *Id.* at ¶ 30.

{¶ 43}    In contrast, for the reasons previously discussed, MCCS established by clear and convincing evidence that the environment in the home would justify the State in assuming guardianship of R.R.   Again, we note that the evidence relied on by S.M. to show that R.R. wanted to return to S.M.'s home and that everything was perfect in R.R.'s life is not persuasive in these circumstances.   To the contrary, the clear and convincing evidence indicated that R.R. was afraid of going back to S.M.'s home, and, in fact, did not want to see S.M.   Accordingly, the decision finding R.R. dependent under R.C. 2151.04(C) was not against the manifest weight of the evidence.

{¶ 44}    Based on the preceding discussion, the Second Assignment of Error is overruled.

IV.   Alleged Procedural Error

{¶ 45}    S.M.'s Third Assignment of Error states that:

The Trial Court Committed Reversible Error in Proceeding Directly to Disposition After Adjudication Without the Consent of the Parties.

{¶ 46}    Under this assignment of error, S.M. contends that the trial court's decision should be reversed because the magistrate proceeded directly to disposition after adjudication without obtaining the consent of the parties.

{¶ 47}    "When a trial court proceeds on an original neglect, dependency, or abuse complaint under R.C. 2151.35(B)(1), it is required to bifurcate the proceedings into an adjudication and a disposition." *In re Baby Boy W.*, 3d Dist. Hancock No. 5-10-39, 2011-Ohio-2337, ¶ 14, citing *Baby Girl Baxter*, 17 Ohio St.3d 229, 233, 479 N.E.2d 257 (1985), and *In re J.H.*, 12th Dist. Preble Nos. CA2005-11-019 and CA2005-11-020,

2006-Ohio-3237, ¶ 22-27. "A trial court need not hold these hearings on separate days or even at separate times; however, 'there must be a definitive bifurcation of the proceedings so that the parties are afforded an opportunity to present evidence at both the adjudicatory and dispositional hearings.' " *Id.* at ¶ 14, quoting *J.H.* at ¶ 27. "A trial court's failure to bifurcate proceedings, as required both by R.C. 2151.35(B)(1) and Juv.R. 34(A), constitutes reversible error." *Id.*, citing *Baxter*, 17 Ohio St.3d at 233, and *In re Malone,* 178 Ohio App.3d 219, 2008-Ohio-4412, 897 N.E.2d 672, ¶ 20 (3d Dist.).

{¶ 48}    In addition to bifurcation, Juv.R. 34(A) requires the parties to consent if the dispositional hearing is held on the same day as the adjudication hearing.   In this regard, Juv.R. 34(A) provides, in pertinent part, that:

> Where a child has been adjudicated as an abused, neglected, or dependent child, the court shall not issue a dispositional order until after it holds a separate dispositional hearing.   The dispositional hearing for an adjudicated abused, neglected, or dependent child shall be held at least one day but not more than thirty days after the adjudicatory hearing is held.   The dispositional hearing may be held immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing and all parties consent to the dispositional hearing being held immediately after the adjudicatory hearing.

{¶ 49}    Courts have found error in juvenile court proceedings where a trial court held adjudicatory and dispositional hearings on the same day without obtaining the consent of the parties.  *See, e.g.*, *In re W.C.*, 2013-Ohio-153, 986 N.E.2d 572, ¶ 24 (12th Dist.); and *J.H.*, 12th

Dist. Preble Nos. CA2005-11-019 and CA2005-11-020, 2006-Ohio-3237, at ¶ 28-29.

{¶ 50}    In arguing that the judgment should be reversed, S.M. relies on the decision in *J.H.*, which reversed the trial court's grant of permanent custody of a child to an agency because the transcript revealed "no explicit demarcation between the adjudicatory and dispositional stages as required under *Baxte*r and the Juvenile Rules."   *J.H.* at ¶ 28.   In addition, the court of appeals in J.H. refused to find a wavier of the consent requirement, because the record did not clearly put the parties on notice that the trial court intended to hold only one evidentiary hearing covering both adjudication and disposition.   *Id.* at ¶ 31-32.

{¶ 51}    In the case before us, there was a definite bifurcation of the proceedings, as well as implied, if not explicit, consent to holding the hearings on the same day.   All parties, including S.M. and her counsel, were present at the beginning of the hearing, when the following exchange occurred:

THE COURT:   * * * Any other preliminary matters?

MR. CHADRICK [Counsel for the State]:   Your Honor, I don't have a preliminary matter as it relates to the adjudication.   It is my understanding, based on the last time we were in court, that it is the State's intent, at least to complete adjudication today and begin disposition and then set another date for disposition on the assertion by Mr. Krumholz [S.M.'s counsel] that he will be bringing in several witnesses of his own.

There is a preliminary issue as it relates to disposition.   I don't know if you want me to address that now, or if you want me to address it before we begin disposition.

THE COURT: Go ahead and address it now just that I have –

MR. CHADRICK: Your Honor, it has been brought to my attention by both Ms. Allen, my caseworker, as well as Ms. Bowling, the Attorney for the child, and Ms. Westwood, the Guardian ad Litem, that the child, [R.R.], has requested that visits with [S.M.] be suspended, if not completely canceled. The child indicates that she does not want to visit with [S.M.] anymore, that the visits actually make her physically ill, and that is something she is no longer interested in.

Based on that, I would make an oral motion for an interim order suspending visits, based on the fact that it was just brought to my attention today and it's based on the child's request.

THE COURT: I'll consider that. I'm not going to rule on it at this time.

MR. CHADRICK: Understandable. And it's a dispositional issue. It is something we were aware of.

THE COURT: Additionally, just so you are aware, before I would be able to rule on that, I would have to have testimony. Additionally, with regard to disposition, I am going to get as far as I can today.

MR. CHADRICK: That's fine.

THE COURT: And if we can finish it, we will. If I can't finish it, then I'll set it over. But otherwise, I do intend on proceeding as far as we can get today.

All right. With regard to adjudication, Mr. Chadrick, you may call your

first witness.

Trial Transcript, Vol. I, pp. 7-9.

{¶ 52}   The magistrate's comments could not have been more clear, and it is also clear that the parties were aware, prior to the hearing, of the intent to address both adjudication and disposition on the same day.  In fact, the parties had previously discussed the procedure at a prior hearing.  Accordingly, the time to object was during the trial court proceedings, not on appeal.

{¶ 53}   After making the above comments, the magistrate heard adjudication evidence, took a recess, and then made lengthy specific findings regarding the abuse and dependency allegations.  *Id*. at pp. 90-95.  After stating its findings, the magistrate again indicated that it would set a dispositional date for the dispositional hearing, but would start with disposition that day and recess the proceedings in order to reconvene later.   At that point, the magistrate asked if there were any preliminary matters to discuss before proceeding to disposition.  *Id.* at p. 95. In response, S.M.'s counsel took the opportunity to raise an issue pertaining to new case law on timing of objections to adjudication findings.  *Id.*   However, S.M.'s counsel did not raise any objections to the timing of the disposition hearing.  *Id.* at 95-96.

{¶ 54}   As a final matter, we note that S.M. was given an opportunity to present witnesses and any other evidence regarding disposition when the dispositional hearing was re-convened two months later.  Accordingly, even if we found any error (which we do not), the error would have been harmless.

{¶ 55}   Based on the preceding discussion, the Third Assignment of Error is overruled.

## V.   Conclusion

**{¶ 56}**    All of S.M.'s assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FAIN, J., and DONOVAN, J., concur.

Copies mailed to:

Mathias H. Heck
Carley J. Ingram
D. Jason Halsey
Jeffrey D. Livingston
Kathryn Bowling
Cynthia Westwood
Hon. Nick Kuntz