[Cite as *In re J.S.*, 2024-Ohio-3310.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE J.S., ET AL.                              :

                                  :           No. 113758

[Appeal by T.M., Mother]                 :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 29, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD23910912 and AD23910913

---

### *Appearances:*

Dunham Law LLC and Michael P. Dunham, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

MARY J. BOYLE, J.:

{¶ 1} Appellant-mother ("Mother") appeals the decision of the Cuyahoga County Juvenile Court terminating her parental rights and awarding custody of her minor children, son J.S. and daughter N.M., to the Cuyahoga County Division of Children and Family Services ("CCDCFS"), raising the following two assignments of error for review:

**Assignment of Error I:** The trial court erred as a matter of law when it did not bifurcate its adjudication and disposition proceedings under [R.C. 2151.35(B)(1)] and Juv.R. 34(A).

**Assignment of Error II:** The trial court's judgment was made with insufficient evidence, and, was against the manifest weight of the evidence.

{¶ 2} For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 3} This matter began in July 2022 when J.S. and N.M. were committed to the predispositional temporary custody of CCDCFS. This complaint could not be resolved within the statutory time frame and the matter was refiled three separate times before the September 21, 2023 complaint was filed in the instant case.[1]

{¶ 4} In the September 2023 complaint, CCDCFS alleges that the children have been in the uninterrupted custody of CCDCFS since July 21, 2022, and that Mother has an ongoing substance abuse problem that she has failed to appropriately address. Most recently, Mother tested positive for cocaine, marijuana, and amphetamines in August 2023. Mother was offered substance abuse services, but has failed to engage on a consistent basis. According to the complaint, J.S. has been previously removed from Mother's care due to her ongoing substance abuse and mental health issues.

---

[1] Two separate cases were filed below: Case No. AD23910912 involves J.S. and Case No. AD23910913 involves N.M. Because most of the documents within these cases are virtually identical, citation to the record will be to Case No. AD23910913 unless a more specific citation is warranted.

{¶ 5} The complaint further alleges that the children's younger sibling, S.P., is currently in the emergency custody of CCDCFS due to Mother's substance abuse, mental health, and housing.[2] The complaint notes that S.P. tested positive for cocaine and marijuana at birth on August 26, 2023. The complaint also alleges that Mother has a mental health issue, which has prevented her from providing adequate care for her children, and that she suffered a mental health crisis, requiring hospitalization while the children were in her care. Mother has been offered mental health services, but has failed to engage in those services on a consistent basis. Additionally, the complaint alleges that mother lacks stable and appropriate housing, noting that her home has a cockroach infestation and a powerful ammonia odor. The complaint further alleges that J.S.'s and N.M.'s alleged respective fathers have failed to establish paternity and have failed to support on a consistent basis, and N.M.'s alleged father was alleged to commit an act of violence before the children.[3] With regard to pending charges, the complaint alleges that Mother has a child endangering case in the Cleveland Municipal Court and N.M.'s alleged father pled guilty to aggravated assault in the Cuyahoga County Common Pleas Court.

{¶ 6} The court granted predispositional temporary custody on September 21, 2023, and the matter was set for adjudicatory hearing on December 18, 2023. At the outset of the adjudicatory hearing, Mother's counsel

---

[2] S.P. was also involved in the trial court proceedings, but is not part of this appeal.

[3] It was later determined at the adjudicatory hearing that N.M.'s father is deceased and J.S.'s alleged father established paternity.

requested a continuance, stating that "I've been in contact with my client throughout the weekend; however, she is not here today and I would ask for a continuance since she's not present." (Tr. 5.) Mother's counsel continued that she does not "have a specific excuse" and she attempted to reach her this morning, but Mother "still has a pending warrant," so Mother's counsel assumed "that has something to do with it." (Tr. 5.) CCDCFS opposed a continuance, stating that the matter has been refiled on multiple occasions and a "continuance would require the refiling again of both cases[.]" (Tr. 6.) The children's guardian ad litem ("GAL") also expressed her position to proceed with the hearing. The trial court denied the continuance, and the following evidence was adduced at the adjudication hearing.[4]

**{¶ 7}** Caitlin Golich, a START Extended Worker with CCDCFS ("Golich"), testified that Mother was first involved with CCDCFS in 2018 after J.S. was placed in emergency custody of the agency. Thereafter, concerns surfaced about drug abuse after N.M. was born exposed to cocaine and marijuana in May of 2020, which led to CCDCFS's reinvolvement. According to Golich, additional concerns arose with respect to Mother's mental health, parenting ability, housing, and the ability to provide basic needs when J.S. was again placed in agency custody along with N.M. in July 2022. Furthermore, CCDCFS was concerned with J.S.'s education because he "had to repeat his kindergarten year once he was in Agency custody due to not

---

[4] The court noted prior to the start of testimony that E.C., who is N.M.'s paternal grandmother, filed a motion to intervene and was not present at the adjudication hearing. E.C., however, later entered the courtroom during the presentation of CCDCFS's case. At that point, the court acknowledged that it would hear from her afterwards.

being enrolled in school for a very long time, and when he was attending school, he attended very inconsistently." (Tr. 12-13.)

{¶ 8} In July 2022, Mother took J.S. to Frontline Mental Healthcare believing him to be possessed by the KKK. Mother's interaction with Frontline staff resulted in her involuntary placement into a mental health care facility. Because Mother could not identify an appropriate caregiver for the children at that time, the police brought the children to CCDCFS. Upon arrival at the agency, the children appeared unbathed, unkempt, and were wearing dirty clothing. N.M. was in possession of a small backpack containing condoms, lighters, cigarettes, and Narcan. At that time, J.S. was five years old and N.M. was two years old.

{¶ 9} CCDCFS later learned that Mother was diagnosed with major depressive disorder and schizophrenia and that Mother had also reported diagnoses of ADHD, PTSD, anxiety, and bipolar disorder. Golich testified that Mother did not consistently engage in treatment for these mental health issues. According to Golich, Mother was referred to multiple service providers for her issues, including Signature Health, Life Solutions South, Moore Counseling, and NORA, among others. Mother "would do phone calls, set up meetings, but then call and reschedule them or not show and then call and reschedule until finally they had to no longer try to reach out to her." (Tr. 31.)

{¶ 10} Golich further testified that she visited Mother's home in the summer of 2022. She described the home as so dirty to the point where she was concerned about the children living there. The floors and walls were brown with dirt, there was

a concern that not all the food in the home was consumable, and there was used cat litter scattered on the floor. Since that visit, Mother has not permitted Golich back into her home, but had visits outside of the home. Golich also described concerns with these visits, including "flies, gnats, things like that that are congregated around that specific unit door as well as the very strong odor of ammonia, and specifically cat urine." (Tr. 21.) Mother also reported that her home was infested with cockroaches.

{¶ 11} Golich testified that the children have remained in uninterrupted custody of CCDCFS since their removal in July 2022. Additionally, approximately a year after J.S. and N.M. had been placed in agency custody, Mother gave birth to S.P. in August 2023, at which time Mother tested positive for cocaine, marijuana, amphetamines, and methamphetamines. Mother also had active warrants for criminal charges of theft and child endangerment, relating to J.S. and N.M. With regard to the children's fathers, Golich testified that paternity was established for J.S.'s father but she has only been able to speak with him once and he has had no contact with J.S. J.S.'s father indicated to Golich that he does not have the ability to care for his son. Paternity was also established with N.M.'s father, but he passed away in August 2023.

{¶ 12} At the conclusion of the adjudication hearing, the magistrate found J.S. and N.M. to be neglected and dependent. The matter then proceeded directly to a separate disposition hearing. Neither Mother, CCDCFS, nor the GAL voiced any objection to proceeding with the disposition hearing. The magistrate stated,

"[W]e're gonna start over here with the Prosecutor." (Tr. 34.) CCDCFS, Mother, and the GAL each waived their opening statement. E.C. stated that she wanted to raise her granddaughter, N.M. The following evidence was then adduced at the disposition hearing.[5]

{¶ 13} Golich testified that CCDCFS developed a case plan for Mother to promote the permanency plan of reunification. This plan included services to address Mother's issues with substance abuse, mental health, housing, basic needs, and educational concerns. The educational concerns resulted from Mother failing to timely enroll J.S. in school, failing to consistently get him to school or to pick him up when he did attend, and disenrolling him before the end of his first school year. These actions led to J.S. repeating kindergarten after entering CCDCFS custody.

{¶ 14} CCDCFS referred Mother to multiple service providers for her identified issues, but she never followed through with her appointments. Mother also previously worked with the Hitchcock Sober Living Home in 2020 for help with her substance abuse issues, but was ultimately kicked out for a rule violation. Mother has not successfully completed a substance abuse treatment program since then and has refused to complete the drug screens requested by CCDCFS.

{¶ 15} With regard to Mother's mental health, at the time of the hearings, Mother was working with Signature Health and had completed an assessment and received a prescription for medication. However, her engagement was inconsistent

---

[5] CCDCFS's request to incorporate all evidence admitted during the adjudication hearing was unopposed and granted by the court.

with scheduled counseling sessions or group sessions and Mother failed to demonstrate any benefit from the services she did attend. Golich noted that parenting services were not a focus of Mother's case plan because of Mother's mental health. Golich explained, "[I]f a person is currently using and currently in an unstable mental health, they can't really focus on learning how to appropriately parent." (Tr. 53.)

{¶ 16} Golich testified to two tragic events that recently happened — the death of N.M.'s father after he was released from prison and J.S.'s sexual assault while in foster care by another child. Golich testified that it was even more vital for Mother to engage in her services in light of this trauma because "if someone has untreated or undertreated mental health, having tragic or difficult life experiences can cause them to spiral. . . . Additionally, with substance use if somebody is sober or trying to get sober, having a tragedy or an unexpected major event happen can kick them back into using and sometimes even more than what they had been previously." (Tr. 64-65.)

{¶ 17} Golich further testified that Mother is bonded with the children, but she does not "know if it would be considered a healthy bond." (Tr. 52.) At the time of the hearing, J.S. was seven years old and N.M. was three years old and had been living in the same home since they were initially brought into custody. Mother had supervised visits scheduled for once a month, which Mother attended inconsistently. Mother would not show up, and J.S. and N.M. would get very upset.

{¶ 18} CCDCFS made multiple attempts to identify kinship caregivers for the children. According to Golich, "[m]any of them have been either not interested or ruled out by the Agency." (Tr. 43.) At the time of the hearing, CCDCFS was investigating the potential placement of all three children with out-of-state relatives and began the ICPC process (Interstate Compact of the Placement of Children) with a relative in Georgia. CCDCFS also considered E.C.'s interest in gaining custody of N.M., but an early childhood mental assessment revealed that separating J.S. and N.M. would not be in their best interest given the strong attachment they have and the detrimental effect the children would experience if they were separated. Another concern CCDCFS had was E.C.'s minimization of her late son's prior violent behavior in the presence of the children and her relinquishment of her visitation time with N.M. to her son during their virtual visits. Golich acknowledged, however, that E.C. had suitable housing and had weekly visits with N.M.

{¶ 19} Mother also had the assistance of CCDCFS Family Advocate Danielle Smith ("Smith"), who aided Mother with the engagement in her treatment services for substance abuse and mental health, as well as monitoring progress and drug screens. Smith repeatedly encouraged Mother to engage in her services since July 2022. Smith testified that Mother refused to engage, claiming either that she "just wasn't ready" or that "she didn't need it." (Tr. 69.) Mother also failed to submit to drug screens despite weekly requests by Smith, and as a result, CCDCFS was unable to verify Mother's sobriety since July 2022. Smith further testified that she observed

Mother's visitation and noted that Mother would focus her attention on J.S. and S.P. and not on N.M., who was left to herself.

{¶ 20} E.C. testified that Mother and N.M. were homeless so they stayed with her, along with the children, from January 2021-July 2021, at which point Mother left with the children. She further testified that J.S. did not get along with her grandson who she takes care of and lives in her home, which was "one of the reasons why [E.C.] can't take [J.S.], because there will be a constant clash between them." (Tr. 77.) E.C. explained that she cannot accept J.S. because J.S. and her grandson "would be at odds every day[.]" (Tr. 86.) She testified that she wanted N.M. out of the foster care system because she has spent time with her and has grown to love her. E.C. testified that she takes care of her 84-year old mother and is her mother's guardian. E.C. acknowledged the concerns for the children's health if they were to be separated and that the recommendation was important, but still felt that "the right thing to do" would be to grant her custody of only N.M. (Tr. 81.)

{¶ 21} The GAL recommended that the court grant permanent custody of J.S. and N.M. to CCDCFS. On cross-examination, the GAL testified that the children are bonded to each other and bonded with Mother. Following closing arguments, the court indicated that it would take the matter under advisement and issue a decision.

{¶ 22} On December 21, 2023, the magistrate issued its decision adjudicating the children neglected and dependent and granting permanent custody of the children to CCDCFS. Mother filed objections to the magistrate's decision and

CCDCFS opposed Mother's objections. On March 8, 2024, the juvenile court overruled Mother's objections and adopted the magistrate's decision. The court found the children to be neglected and dependent, denied E.C.'s motion to intervene, terminated all parental rights, and ordered the children placed in the permanent custody of CCDCFS.[6] In its extensive judgment entry, the court found by clear and convincing evidence that it is in the best interests of the children to be placed in the permanent custody of CCDCFS. The court further found that the children have been in CCDCFS custody for 12 months or more of a consecutive 22-month period and cannot or should not be placed with either parent. The court adopted the permanency plan, which is permanent custody.

{¶ 23} Mother now appeals the court's judgment.

## II. Law and Analysis

### A. Bifurcation of the Adjudication and Disposition Hearings

{¶ 24} In the first assignment of error, Mother argues that the court erred in holding the disposition hearing immediately following the adjudication hearing because she did not consent to the hearings being heard consecutively.

{¶ 25} R.C. 2151.35 and Juv.R. 34 govern the manner for holding the adjudicatory and dispositional hearings on an original complaint for custody. The statute provides in pertinent part:

> If the court at an adjudicatory hearing determines that a child is an abused, neglected, or dependent child, the court shall not issue a

---

[6] The court noted that its decision does not prevent E.C. and CCDCFS "from exploring adoption options at a later date should the ICPC investigation of out of state relatives be frustrated." (Judgment Entry, Mar. 8, 2024.)

dispositional order until after the court holds a separate dispositional hearing. *The court may hold the dispositional hearing for an adjudicated abused, neglected, or dependent child immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing.*

(Emphasis added.) R.C. 2151.35(B)(1).

{¶ 26} Similarly, Juv.R. 34(A) provides in pertinent part:

Where a child has been adjudicated as an abused, neglected, or dependent child, the court shall not issue a dispositional order until after it holds a separate dispositional hearing. The dispositional hearing for an adjudicated abused, neglected, or dependent child shall be held at least one day but not more than thirty days after the adjudicatory hearing is held. *The dispositional hearing may be held immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing and all parties consent to the dispositional hearing being held immediately after the adjudicatory hearing.*

(Emphasis added.)

{¶ 27} Although Juv.R. 34(A) mirrors most of the language of the statute, it contains an additional requirement before the trial court may hold the dispositional hearing on the same day as the adjudicatory hearing — the parties must consent. *In re D.H.*, 2008-Ohio-3686, ¶ 23 (8th Dist.), citing *In re J.H.*, 2006-Ohio-3237, ¶ 29 (12th Dist.) Additionally, the rule creates a mandatory requirement that the dispositional hearing be held "at least one day" after the adjudicatory hearing if the parties have not consented.

{¶ 28} Here, Mother cites to the following line of cases from various appellate districts in the state, including this district, in support of her position that Juv.R. 34(A) and R.C. 2151.35(B) require that the adjudication and disposition

hearings must be bifurcated: *In re Balazy*, 2001 Ohio App. LEXIS 984 (8th Dist. Mar. 8, 2001); *In re G.M.*, 2015-Ohio-582 (9th Dist.); *In re J.H.*, 2006-Ohio-3237 (12th Dist.); *In re Monroe*, 2004-Ohio-4988 (7th Dist.). Mother's reliance on these cases is misplaced.

{¶ 29} These cases are factually distinguishable because either the parent was not present at the adjudication hearing, the hearings proceeded without parent's counsel, the parent did not have notice of the adjudication and disposition hearings, the parent expressed that they did not consent to the hearings being held on the same day, there was no explicit demarcation between the adjudicatory and dispositional stages, or dispositional testimony was introduced at the adjudicatory stage of the proceedings. Rather, the circumstances of the instant case are analogous to those of *In re R.R.*, 2014-Ohio-5579 (2d Dist.).

{¶ 30} In that case, the Second District Court of Appeals held that the express consent of the parties was not necessary to satisfy the requirements of Juv.R. 34(A) because "[t]here was a definite bifurcation of the proceedings, as well as implied, if not explicit, consent to holding the hearings on the same day" and the appellant presented additional testimony on the merits when the disposition hearing was continued. *Id.* at ¶ 51, 54.

{¶ 31} In *R.R.*, the parties, including appellant and her counsel, were present at the beginning of the adjudication hearing when the magistrate discussed holding the disposition hearing immediately after adjudication. Appellant's counsel did not object to the timing of the disposition hearing. The magistrate then heard

adjudication evidence, took a recess, and then made findings regarding the abuse and dependency allegations. Afterwards, the magistrate indicated that it would start with disposition that day and recess the proceedings in order to reconvene later. At that point, the magistrate asked if there were any matters to discuss before proceeding to disposition. Appellant's counsel raised an issue pertaining to new law on the timing of objections to adjudication findings, but did not raise any objections to the timing of the disposition hearing. *Id.* at ¶ 53. Additionally, the parties were aware of the intent to address both adjudication and disposition on the same day because they discussed the procedure at a prior hearing. *Id.* at ¶ 52. As a result, the *R.R.* Court found that the time to object was during the court proceedings, not on appeal. *Id.* The court noted that appellant "was given an opportunity to present witnesses and any other evidence regarding disposition when the dispositional hearing was re-convened two months later. Accordingly, even if we found any error (which we do not), the error would have been harmless." *Id.* at ¶ 54.

{¶ 32} Similarly, in the matter before us, the record clearly demonstrates that there was a definite bifurcation of the adjudication and disposition hearings and Mother, through her counsel, consented to holding the hearings on the same day. The transcript of the proceedings reveals that at the beginning of the adjudication hearing, Mother's counsel requested a continuance, stating that Mother "is not here today" and she does not "have a specific excuse," but Mother "still has a pending warrant," so Mother's counsel assumed "that has something to do with it." (Tr. 5.) CCDCFS opposed and the magistrate denied the continuance.

**{¶ 33}** At the conclusion of CCDCFS's portion of the adjudication hearing, the magistrate asked Mother's counsel if there were "any witnesses for adjudication?" Mother's counsel replied, "No, your Honor." (Tr. 32.) The magistrate then indicated that "[t]he Court is prepared to proceed to disposition on all matters" and allowed counsel to make opening statements as to disposition. (Tr. 33.) Mother's counsel waived opening statement. The magistrate then asked CCDCFS to call its first witness for the disposition hearing. Mother acknowledges as much within her appellate brief where her statement of the case contains separate headings titled "Adjudication Trial" and "Disposition," in which she describes the testimony relating to each hearing. (Mother's appellate brief, p. 6-7.) Additionally, Mother had "[n]o objection to incorporating all testimony from adjudication into disposition." (Tr. 36.) At the conclusion of CCDCFS's portion of the disposition hearing, the magistrate asked Mother's counsel if there were any "[w]itnesses?" Mother's counsel replied, "No, your Honor." (Tr. 74.)

**{¶ 34}** At no time did Mother's counsel or any other party object to the disposition hearing being held immediately after the adjudicatory hearing, nor was any objection made prior to hearings when the court scheduled both adjudication and disposition to be held on the same day, which was evidenced by the juvenile court's journal entry issued on November 2, 2023, stating that "[t]his matter is continued to December 18, 2023 at 9:00am for Adjudication and Disposition." (Journal Entry, Nov. 2, 2023.) According to the entry, the matter was scheduled for

a hearing on November 2, 2023, but "Mother did not appear" and a pretrial was held. (Journal Entry, Nov. 2, 2023.)

{¶ 35} Based on the foregoing, it is clear that there was a definite bifurcation of the proceedings, as well as consent by Mother to hold the hearings on the same day. Mother was aware, prior to the hearing, of the court's intent to address both adjudication and disposition on the same day and chose not to attend the hearings. Additionally, Mother was given an opportunity to present witnesses and any other evidence regarding disposition. Thus, "even if we found any error (which we do not), the error would have harmless." *In re R.R.* at ¶ 54.[7]

{¶ 36} Accordingly, the first assignment of error is overruled.

## B. Permanent Custody

{¶ 37} In the second assignment error, Mother argues that the juvenile court's decision to terminate her parental rights and grant permanent custody of the children to CCDCFS is not supported by sufficient evidence and is against the manifest weight of the evidence.

### 1. Standard of Review

{¶ 38} At the outset, we recognize that the right to raise one's own child is "an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting

---

[7] We note that while CCDCFS alternatively argues that Mother cannot demonstrate plain error in the proceedings and Mother argues plain error in her reply brief, we decline to address plain error and find the analysis in *In re R.R.* more persuasive.

*Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This right, however, is not absolute. "'The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974).

{¶ 39} The Supreme Court of Ohio has recently provided guidance on the standard of review in permanent custody cases. The Court held:

> [T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments presented by the parties.

*In re Z.C.*, 2023-Ohio-4703, ¶ 18.

{¶ 40} Mother bases her argument on both the sufficiency-of-the-evidence and manifest-weight-of-the-evidence standards. We note that while "sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re R.M.*, 2024-Ohio-1885, ¶ 46 (8th Dist.), citing *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.), citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.). Thus, we will review this matter under the manifest-weight-of-the-evidence standard.

{¶ 41} The *In re Z.C.* Court reexplained the manifest-weight-of-the-evidence standard as follows:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

### 2. Permanent Custody — R.C. 2151.414

{¶ 42} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re B.P.*, 2023-Ohio-1377, ¶ 27 (8th Dist.), citing *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the

child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.  R.C. 2151.414(B)(1)(a)-(e).

{¶ 43} The second prong of the analysis requires the juvenile court to determine, by clear and convincing evidence, that granting permanent custody to the agency is in the best interest of the child.  R.C. 2151.414(B)(1).  "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'"  *In re Z.C.* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### a.  The R.C. 2151.414(B)(1) Factors and R.C. 2151.414(E)

{¶ 44} In the instant case, the juvenile court made the findings under R.C. 2151.414(B)(1)(a) that the children could not or should not be placed with one of the child's parents.  In cases where R.C. 2151.414(B)(1)(a) applies, R.C. 2151.414(E) enumerates several factors for the court to consider.  *In re D.H.*, 2022-Ohio-2780, ¶ 28 (8th Dist.), citing *In re L.J.*, 2022-Ohio-2278, ¶ 43 (8th Dist.); *see also In re L.C.*,

2022-Ohio-1592, ¶ 47 (8th Dist.). Pursuant to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(16) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 45} Here, while the trial court found the presence of three (E) factors — (E)(1), (2), and (4), our discussion focuses on (E)(4), the lack of commitment, since the court is only required to find one of the R.C. 2151.414(E) factors present in order to enter a finding that a child cannot or should be placed with a parent. *In re D.H.* at ¶ 29, citing *In re L.W.*, 2019-Ohio-1343 (8th Dist.). R.C. 2151.414(E)(4) provides in pertinent part:

> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child

{¶ 46} Mother argues that there was insufficient evidence of the "lack of commitment" and the court lost its way in finding that Mother showed a lack of commitment to her children because she is undergoing treatment and is taking her medication. We disagree.

{¶ 47} The evidence at the disposition hearing revealed that Mother demonstrated a lack of commitment to the children through her lack of consistent visitation with the children, her unwillingness to complete the necessary steps in her case plan addressing her mental health and substance abuse problems, and her unwillingness to provide an adequate permanent home for the children. Mother

was inconsistent in attending her regularly scheduled visitation with the children, which led to the reduction in frequency of visits to once a month. Golich testified that the inconsistent visits had a detrimental impact on the children, especially the instances where Mother failed to appear for the scheduled visits. Mother also failed to address her substance abuse and mental health issues. She was discharged from the Hitchcock Sober Living Home in 2020 for violating their rules, which was prior to the children's removal in July 2022. At the time of disposition, Mother was not engaged in any substance abuse treatment and had refused to complete drug screens as requested by CCDCFS. Additionally, Mother tested positive for multiple illegal drugs at S.P.'s birth in August 2023. According to Golich, when encouraging Mother to engage in substance abuse treatment following S.P.'s birth, Mother replied, "I did my work two years ago. I'm sober." (Tr. 62.) With regard to Mother's mental health services, the record reveals that Mother has a number of diagnoses, including major depressive disorder, schizophrenia, PTSD, ADHD, anxiety, and bipolar disorder. Mother completed an assessment and received a prescription for medication, but her engagement was very inconsistent with scheduled counseling sessions or group sessions and she failed to demonstrate any benefit from the services she did attend. With respect to Mother's housing, Golich testified that Mother has refused to permit access to the interior of her home since the summer of 2022, at which time it was observed to be in deplorable condition, and Mother's home has been infested with cockroaches and odors of ammonia and cat urine.

{¶ 48} Based on the foregoing, we find that the first prong of the permanent-custody analysis was supported by competent, credible evidence and was not against the manifest weight of the evidence. The record clearly and convincingly supports the juvenile court's determination under R.C. 2151.414(B)(1)(a) that the children cannot or should not be placed with Mother within a reasonable time.

{¶ 49} Having found that the juvenile court properly determined that at least one of the R.C. 2151.414(B)(1) factors applies by clear and convincing evidence, we must next determine whether the juvenile court appropriately found by clear and convincing evidence that granting permanent custody to CCDCFS is in the children's best interest under R.C. 2151.414(D).

### b. R.C. 2151.414(D)(1) — Best Interest Determination

{¶ 50} The R.C. 2151.414(D)(1)(a)-(e) factors include (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; (b) the child's wishes, as expressed directly by the child or through the child's guardian ad litem; (c) the child's custodial history; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1), however, needs to be resolved in favor of permanent custody.

*In re D.H.*, 2022-Ohio-2780, at ¶ 46, citing *In re G.W.*, 2019-Ohio-1533, ¶ 72 (8th Dist.).

**{¶ 51}** With regard to R.C. 2151.414(D)(1)(a), Golich acknowledged that Mother bonded with the children, but it was not a healthy bond. During visitation, Mother would focus her attention on J.S. and S.P. to the exclusion of N.M., who was left to herself. Golich further testified that that the children "have really blossomed since they've been in custody." (Tr. 46.) There was also a relationship between N.M. and E.C., but the court noted that pediatric psychologists determined that splitting up the two children would threaten their long-term mental health. The court considered all of the foregoing and still found in favor of permanent custody. This finding is supported by clear and convincing evidence.

**{¶ 52}** R.C. 2151.414(D)(1)(b) requires the court to consider the children's wishes as expressed directly or through their GAL. At the time of disposition, J.S. was seven years old and N.M. was three years old. The GAL recommended permanent custody, stating that permanent custody was in the children's best interests. The court's finding is supported by clear and convincing evidence.

**{¶ 53}** R.C. 2151.414(D)(1)(c) requires the court to consider the children's custodial history, including whether the children have been in placement for 12 or more months of a consecutive 22-month period. Here, the court noted that the children have remained in continuous CCDCFS custody since July 2022. Therefore, the children have been in agency custody for 12 or more months of a consecutive 22-

month period at the time of disposition in December 2023. The evidence clearly and convincingly supports this finding.

{¶ 54} R.C. 2151.414(D)(1)(d) requires the court to consider the children's need for a legally secure placement and whether such can be achieved without a grant of permanent custody. During the pendency of the proceedings, CCDCFS attempted to identify relatives who might qualify to serve as alternative caregivers for the children. According to Golich, "[m]any of them have been either not interested or ruled out by the Agency." (Tr. 43.) At the time of the hearing, CCDCFS was investigating the potential placement of all three children with out-of-state relatives and began the ICPC process with a relative in Georgia. Additionally, the court acknowledged that E.C. wanted custody of N.M., but found that it is not in N.M.'s best interest to be placed with E.C. because of the mental health assessment and E.C.'s admission that J.S. and E.C.'s grandson "are at odds with each other." (Judgment Entry, Mar. 8. 2024.) This evidence clearly and convincingly supports the court's finding that the children's need for secure placement cannot be satisfied by Mother or E.C.

{¶ 55} R.C. 2151.414(D)(1)(e) requires the trial court to consider whether any of the factors in sections (E)(7) to (11) apply. While the court noted that Mother has a child endangerment case with a warrant in the Cleveland Municipal Court, the record does indicate if Mother was ever convicted and the court did not specifically consider any of these factors. Therefore, R.C. 2151.414(D)(1)(e) does not appear to apply to Mother.

{¶ 56} Based on the foregoing, there is clear and convincing evidence in the record to support the court's determination that permanent custody to CCDCFS is in the children's best interest. Accordingly, we find that the court's decision to grant permanent custody is not against the weight of the evidence as Mother contends.

{¶ 57} Therefore, the second assignment of error is overruled.

{¶ 58} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR